UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

130/40 ESSEX STREET DEVELOPMENT CORP.,

                Chapter 11
                Case No. 03-40944 (PCB)

            Debtor.
----------------------------------------------------------------X

130/40 ESSEX STREET DEVELOPMENT CORP.,

        Plaintiff,

          v.                      Adversary Proceeding No.

THE CITY OF NEW YORK and
THE NEW YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,          **COMPLAINT**

        Defendants.

----------------------------------------------------------------X

      130/40 Essex Street Development Corp., chapter 11 debtor in the above-captioned case (the "Debtor" or "130/40 Essex Street"), by its Special Counsel, Law Office of Laurence J. Kaiser, for its Complaint against the City of New York ("City") and the New York Economic Development Corporation ("EDC"), hereby alleges upon knowledge as to its own acts and upon information and belief as to the acts of others, as follows:

### PRELIMINARY STATEMENT

      1.     This is an action under New York law and the Bankruptcy Code with respect to a certain lease dated as of February 12, 1998 (the "Lease") between 130/40 Essex Street as tenant and the City as landlord and EDC as administrator of the Lease on behalf of the landlord for a building located at 130/40 Essex Street.

2.      130/40 Essex Street seeks judgment

(a)      avoiding or setting aside a fraudulent transfer or conveyance or granting 130/40 Essex Street damages to be proved at trial on account thereof pursuant to sections 544(b) and 548 of the Bankruptcy Code and the New York Debtor and Creditor Law;

(b)      granting 130/40 Essex Street the redemption or reinstatement of the Lease pursuant to New York law as a result of the Debtor's exercise of its statutory right of redemption  pursuant to section 761 of the New York Real Property Actions and Procedures Law (the "RPAPL");

(c)      vacating the warrant of eviction on equitable grounds pursuant to section 749(3) of the RPAPL;

(d)      granting 130/40 Essex Street damages on account of the City and EDC's breaches of the Lease; and

(e)      granting 130/40 Essex Street declaratory relief with respect to the Purchase Option in the Lease.

## THE PARTIES

3.      Plaintiff 130/40 Essex Street is a New York corporation with a principal place of business at 130/40 Essex Street, New York, New York 10002.

4.      Defendant City is a New York municipal corporation, acting in this case and with respect to this lease by its Commissioner of Building Services, with an office at 110 William Street, New York, New York 10038.

5.      Defendant EDC is a corporation existing under the law of the State of New York with an address and office in the City of New York.   EDC is the administrator of the Lease for the City of New York and has, in all material respects, acted as, and pursuant to the Lease has the authority to act on behalf of the City as, the landlord.

## JURISDICTION

6.      130/40 Essex Street is a chapter 11 debtor in this court.

7.      This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and the General Order of reference in this District.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

9.      This is a core proceeding.  To the extent, if any, that the Court

should hold that this proceeding is not core, then 130/40 Essex Street consents to

the entry of final orders or judgment by this Court.

## BACKGROUND FACTS

10.     In late 1996, Henry Rainge-Megill first approached the City about

obtaining a lease for 130/40 Essex Street, a building at the northwest corner of

Essex and Rivington streets.

11.     Mr. Rainge-Megill had resided in the neighborhood for many years

and was a well-known and well-respected member of the community.

12.     The building previously had functioned as and was known as the

"Essex Street Market," but the building had been vacant for over 15 years.

13.     It was a large structure of approximately 11,000 square feet,

comprised of a large open space, which could be subdivided, and five (5) kiosks

on Essex Street.

14.     The building, like the neighborhood, was in a state of significant

disrepair.  The block served as a magnet for drug dealers and other undesirables.

15.     Mr. Rainge-Megill saw the opportunity to restore and rehabilitate

the property as a banquet hall and restaurant and to reopen the kiosks.

16.     He prepared a business plan that set forth his vision for the

building.

17.     He intended to make the property productive, to offer services not

otherwise available in the community and, as he pledged in his business plan, to

provide jobs for local residents.

18.     The City and EDC agreed that the restoration of the building and its re-opening would be of substantial benefit to the community and the neighborhood.

19.     The City and EDC and Mr. Rainge-Megill discussed a lease pursuant to which Mr. Rainge-Megill would be obligated to reconstruct, restore and rehabilitate the building.

20.     At or about this time, a broker valued the building at approximately $20,000 and the land at approximately $80,000.

21.     Although Mr. Rainge-Megill had restaurant and food experience, the City and EDC required that Mr. Rainge-Megill take on a contractor/developer as partner.

22.     Mr. Rainge-Megill entered into an agreement with Glenn McDermott, of GDM Development, providing that Mr. McDermott would acquire 49% of the equity in the project in exchange for rehabilitating and reconstructing the space.

23.     Mr. Rainge-Megill formed 130/40 Essex Street.

24.     Mr Rainer-Megill then was, and still is, the sole shareholder of 130/40 Essex Street.

25.     130/40 Essex Street and EDC executed the Lease in February 1998.

26. Pursuant to the Lease, 130/40 Essex Street agreed *inter alia*

    (a)    To make all the tenant improvements on the property at its sole cost and expense (originally estimated and budgeted to be only $450,000) within nine (9) months.

    (b)    To use the main portion of the building for a banquet hall and restaurant.

    (c)    To keep the premises in operation at least twelve (12) hours a day, seven (7) days a week.

    (d)    To use at least fifty percent (50%) of the space for food services.

    (e)    To hire local residents as employees.

27. To recover its substantial up-front construction costs and its expenses during the period before the premises could be open and revenues could be generated, 130/40 Essex received:

    (a)    A nine month construction period.

    (b)    Abatement from all real estate taxes or payment in lieu thereof for the first two (2) years of the Lease and an abatement of 50% of real estate taxes or payment in lieu thereof for the next three (3) years.

    (c)    Annual base rent of approximately $5 per square foot for the first three (3) years.

28. Problems arose almost immediately after the Lease was signed.

29. The contractor, GDM, defaulted and failed to make necessary payments to subcontractors and suppliers.

30.     As a result of the years of dereliction and abuse, unforeseen infrastructure obstacles were found, including the following:

(a)     The foundation was found to have eroded, due to improper drainage from a connecting building.

(b)     The roof drainage was completely rotted away, causing substantial damage to the ceiling.

(c)     There were significant, unanticipated and latent gas, plumbing, and electrical deficiencies.

31.     The multiple problems dramatically slowed the project and increased the cost, as EDC was advised and knew.

32.     Mr. Rainge-Megill used his funds and money borrowed from family members to pay GDM's subcontractor and supplier debts in an effort to avoid mechanics' liens and complete the project by or near its original nine month deadline.

33.     Mr. Rainge-Megill completed all major tenant improvements (e.g., flooring, walls, windows, skylights).  However, unanticipated infrastructure problems and delays caused the construction costs to exceed $1 million, or more than twice the original $450,000 estimate.

34.     After nine months, approximately 95% of the project was completed, but Mr. Rainge-Megill had exhausted his personal and family finances.

35.     The hard and soft construction costs were approximately $1.3 million, including over $550,000 of Mr. Rainge-Megill's own money, over

$500,000 borrowed from his family and additional monies owed to certain suppliers and contractors.

36.     Unable to pay rent and finance the completion of the work, Mr. Rainge-Megill began looking for a third-party to finance completion of the project.

37.     These efforts were made more difficult and frustrated because the City and EDC actively and without cause discouraged potential partners/investors.

38.     In late 1999, 130/40 Essex Street defaulted on its rent, and the City and EDC began summary non-payment proceedings to evict the corporation and recover the leasehold.

39.     When the City and EDC brought its summary proceeding for non-payment of rent, over $1 million had been invested to improve the property and, as noted, 95% of the project was complete.

40.     The past due rent was approximately $36,000 or less than 5% of what 130/40 Essex Street had already invested in the reconstruction and restoration of the building.

41.     The value of the building and leasehold was many times the value of the property when the Lease was first executed in 1998 (when the building was valued at $20,000 and the land was valued at $80,000).

42.     In large part as a result of the redevelopment of the Essex Street market space and Mr. Rainge-Megill's efforts to clean up the neighborhood, neighborhood property values had risen substantially.

43.     In an effort to obtain time and forestall eviction, the lawyer for 130/40 Essex Street agreed to a Stipulation providing for full payment of the past-due rent.

44.     The first payment was due on November 25, 1999 or two weeks after the signing of the Stipulation.

45.     Mr. Rainge-Megill sought financing to make the payment.

46.     Unfortunately, Mr. Rainge-Megill could not secure the financing from his family members until after the first payment was due.

47.     The City and EDC continued unreasonably and without justification to oppose and not approve any prospective third-party lender or investor.

48.     Mr. Rainge-Megill was unable to obtain financing by the time that payment was due under the Stipulation.

49.     However, at the very next civil court appearance, in February 2000, 130/40 Essex Street tendered a certified check for all the rent arrears.

50.     The City and EDC refused the tendered payment and the warrant of eviction was issued.

51.     130/40 Essex Street thereafter sought to vacate the warrant of eviction pursuant to section 749(3) of the Real Property Actions and Procedure Law.

52.     The Civil Court denied 130/40 relief.

53.     130/40 Essex Street appealed to the Appellate Term.

54.     The Appellate Term granted a stay of execution of the warrant of eviction conditioned on payment of all rent arrears and payment of any rent accruing during while the appeal was pending.

55.     130/40 Essex Street paid all past due rent and timely paid all rent that accrued during the appeal.

56.     The Appellate Term reversed the Civil Court and vacated the warrant.

57.     The City and EDC appealed to the Appellate Division.

58.     130/40 Essex Street paid – and the City and EDC accepted – all rent that came due after the Appellate Term vacated the warrant and reinstated the Lease.

59.      In order to pay the rent, 130/40 Essex Street again had to obtain funds from a third party.

60.     The appeal by the City and EDC prevented 130/40 Essex Street from completing the remaining 5% of construction, leaving 130/40 Essex Street without any income.  In addition, the City and EDC harassed 130/40 Essex Street and frustrated efforts to use the premises, including for holiday parties at the end of 2001.

61.     In March 2003, the Appellate Division reversed the Appellate Term and reinstated the warrant of eviction.

62.     At the time of the bankruptcy filing, 130/40 Essex Street owed the City and EDC only one week's rent.

63.     During the chapter 11 case, the City and EDC have:

(a)     Opposed 130/40 Essex Street's effort to obtain counsel to represent it.

(b)     Objected to 130/40 Essex Street's effort to obtaining financing to protect its rights in the leasehold.

(c)     Obstructed 130/40 Essex Street's efforts to complete the restoration of the property, obtain a certificate of occupancy and open the property in accordance with the provisions of the Lease and the original business plan.

## AS AND FOR A FIRST CAUSE OF ACTION
### (FRAUDULENT CONVEYANCE- § 548)

64.     130/40 Essex Street incorporates and re-alleges paragraphs 1 through 63 hereof as if fully set forth herein.

65.     The Lease and the leasehold had a substantial value when the warrant of eviction first issued.

66.     The Lease and the leasehold had a substantial value when the Appellate Division reinstated the warrant of eviction.

67.     The Lease and the leasehold have a substantial value today, when the Debtor faces termination or loss of its rights in the Lease and leasehold.

68.     The issuance of the warrant of eviction terminated the Lease as provided by RPAPL §749 (subject to vacatur of the warrant and reinstatement of the Lease as provided in that section).

69.     The Lease and the leasehold are interests in property.

70.     The termination or loss of the Lease or the leasehold was a transfer as provided and defined in the Bankruptcy Code.

71.    In consideration of the transfer, the City or EDC received the Leasehold and recovered a fee interest in a building that had a value substantially greater than when the Lease was executed.

72.    In consideration of the transfer, 130/40 Essex Street received only relief from its obligation to pay future rent under the Lease.

73.    130/40 Essex Street received less than a reasonably equivalent value in exchange for the transfer of the Lease to the City or EDC.

74.    At the time that the warrant of eviction issued, the Debtor was insolvent or became insolvent as a result of the transfer of the Lease.

75.    The reinstatement of the warrant of eviction by the Appellate Division took place within one (1) year of the filing of the bankruptcy petition in this case.

76.    The transfer of the Lease or leasehold is avoidable pursuant to section 548 of the Bankruptcy Code.

77.    The City or EDC is or will be the initial transferee of the Lease or leasehold.

78.    The Debtor is entitled to (a) avoid the transfer of the Lease and leasehold, (b) reinstatement of the Lease and (c) recovery of the leasehold for the benefit of the estate.

### AS AND FOR A SECOND CAUSE OF ACTION
### (FRAUDULENT CONVEYANCE- § 544(b))

79.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 78 hereof as if fully set forth herein.

80.     At the time of the issuance of the warrant of eviction in 1999 or 2000, the Debtor had unsecured creditors who held claims that are allowable under section 502 of the Bankruptcy Code.

81.     At the time of the reinstatement or re-issuance of the warrant of eviction pursuant to the decision of the Appellate Division in 2003, the Debtor had unsecured creditors who held claims that are allowable under section 502 of the Bankruptcy Code.

82.     The issuance or reinstatement or re-issuance of the warrant of eviction effected a termination of the Lease and the leasehold.

83.     The Lease and the leasehold are interests in property.

84.     The termination of the Lease or the leasehold constituted a conveyance or transfer of the Lease or leasehold to the City or EDC in accordance with New York law.

85.     At the time of the issuance or reinstatement or re-issuance of the warrant, the Debtor was insolvent or was rendered insolvent as a result of the conveyance or transfer of the Lease or the leasehold.

86.     The issuance of the warrant of eviction and its reinstatement or re-issuance took place within six (6) years of the date hereof.

87.     The Debtor received less than fair consideration for the conveyance of the Lease or leasehold to the City or EDC.

88.     The conveyance or transfer of the Lease or leasehold is avoidable as a constructive fraud pursuant to the New York Debtor and Creditor Law.

89.     Pursuant to section 544 (b) of the Bankruptcy Code, the Debtor may avoid any transfer or an interest of the Debtor in property that is voidable under New York state law.

90.     The City or EDC is or will be the initial transferee of the Lease or leasehold.

91.     The Debtor is entitled to (a) avoid the transfer of the Lease and leasehold, (b) reinstatement of the Lease and (c) recovery of the leasehold for the benefit of the estate.

### AS AND FOR A THIRD CAUSE OF ACTION
### (FRAUDULENT CONVEYANCE- § 544(b))

92.     130/40 Essex Street incorporates and re-alleges paragraphs 1 through 91 hereof as if fully set forth herein.

93.     In November 1999, the Debtor entered into a stipulation that obligated the Debtor to pay all rent arrearages within a specified time.

94.     The Appellate Division held that the entry into that stipulation constituted the assumption of an obligation by the Debtor.

95.     The Appellate Division held that by entering into the stipulation the Debtor undertook an obligation which was avoidable only pursuant to those principles of law that permit the avoidance of a contract or its obligations.

96.     The assumption of the obligation under the stipulation is avoidable as a constructive fraud pursuant to the New York Debtor and Creditor Law.

97.     At the time of the stipulation, the Debtor was insolvent or was rendered insolvent as a result of the stipulation.

98.     The Debtor received less than fair consideration in exchange for the obligation to pay rent arrearages immediately as provided in the stipulation.

99.     Pursuant to section 544(b) of the Bankruptcy Code the Debtor may avoid obligations of the Debtor that are avoidable under New York state law.

100.    The Debtor is entitled to avoid the stipulation.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (EQUITY OF REDEMPTION – RPAPL § 761)

101.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 100 hereof as if fully set forth herein.

102.    The action which the City or EDC brought in the Civil Court to evict 130/40 Essex Street was a summary proceeding founded upon an allegation that the Debtor was in default in the payment of rent.

103.    At the time of the original issuance of the warrant of eviction, more than five (5) years remained on the Lease term.

104.    At the time of the reinstatement of the warrant of eviction by the Appellate Division, more than five (5) years remained on the Lease term.

105.    RPAPL § 761 requires that a waiver of a right of redemption be recorded in the applicable county in order to be effective.

106.    RPAPL § 761 requires that a waiver of a right of redemption be recorded in the applicable county in order to be effective.

107.    The Lease was not recorded.

108.    No memorandum of the Lease was recorded.

109.    No memorandum was recorded setting forth any waiver of the right of redemption provided by New York law.

110.    The warrant of eviction has not issued.

111.    The premises have not been re-let to any other party.

112.    The Debtor is excused from tendering the amount which constitutes the full rent arrears plus interest thereon through the date of tender as a result of its filing of its bankruptcy petition.

113.    The Debtor is be ready, willing and able to tender the full rent arrears plus interest thereon upon the entry of an order of this Court permitting such payment to be made and determining that the making of such payment reinstates the Lease and leasehold.

**AS AND FOR A FIFTH CAUSE OF ACTION
(EQUITY OF REDEMPTION – RPAPL § 761)**

114.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 113 hereof as if fully set forth herein.

115.    The Lease is not a Real Estate Board of New York standard form lease, but is a complicated document of almost 150 pages and five (5) exhibits.

116.    There is no clear and unequivocal waiver of redemption in the Lease.

117.    Section 24.04 is entitled "Waiver of Rights of Tenant."  There is no waiver of the right of redemption in that section, where it would be expected to be and where it should be if the tenant contemplated and agreed to waive its statutory right of redemption.

118.    Section 24.07, entitled "Waiver of Service," *inter alia* provides that the tenant "also waives any and all (a) right of redemption provided by law or statute now in force or hereafter enacted or otherwise . . ."

119.    By contrast, the Real Estate Board of New York standard form of lease contains a waiver of the right of redemption in a section of the lease entitled – and imprinted in bold text – "**Remedies of Owner and Waiver of Redemption**."

120.    The misleading placement of the aforementioned language in the Lease renders that language ineffective to effect a waiver of the statutory right of redemption.

121.    The warrant of eviction has not issued.

122.    The premises have not been re-let to any other party.

123.    The Debtor is excused from tendering the amount which constitutes the full rent arrears plus interest thereon through the date of tender as a result of its filing of its bankruptcy petition.

124.    The Debtor is be ready, willing and able to tender the full rent arrears plus interest thereon upon the entry of an order of this Court permitting such payment to be made and determining that the making of such payment reinstates the Lease and leasehold. .

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(VACATUR OF THE WARRANT – RPAPL §749(3))**

125.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 124 hereof as if fully set forth herein.

126.    Section 749(3) of the New York RPAPL grants the Court "the power to vacate [a] warrant for good cause shown prior to the execution thereof."

127.    No warrant has been executed to date.

128.     Although the Appellate Division held that a stipulation limited the power of a court to vacate a warrant, the vacatur of the stipulation avoids or eliminates that limitation on the court's statutory equitable power.

129.     Based on the facts of this case, including but not limited to the fact that the Debtor paid all rent to the City or EDC, the fact that the City or EDC accepted all pre-petition rent, the fact that the Debtor invested over $1 million in the property and leasehold and the fact that the City or EDC will suffer no prejudice by reinstatement of the Lease or the leasehold because the City and EDC will be placed in the same position that they would have been had there been no default in the payment of rent.

130.     New York law permits successive or multiple requests for vacating a warrant of eviction.

131.     The City and EDC have not re-let the premises to any other party.

132.     Upon the avoidance of the stipulation pursuant to New York law, this Court is permitted to – and should – exercise its equitable power under New York state law to vacate the warrant of eviction and reinstate the Lease and the leasehold and prevent the forfeiture of the valuable Lease and leasehold.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (VACATUR OF THE WARRANT – RPAPL §749(3))

133.     130/40 Essex Street incorporates and re-alleges paragraphs 1 through 132 hereof as if fully set forth herein.

134.     After the decision of the Civil Court denying 130/40 Essex Street relief pursuant to RPAPL § 749 (3) vacating the warrant, 130/40 Essex Street appealed to the Appellate Term.

135.    The Appellate Term granted 130/40 Essex Street a stay of execution of the warrant pending the decision on appeal conditioned on the payment of all rent accrued and accruing during the appeal.

136.    130/40 Essex Street paid all rent in accordance with the conditions of the stay.

137.    The Appellate Term reversed the Civil Court and vacated the warrant.

138.    The City and EDC appealed to the Appellate Division.

139.    After the decision of the Appellate Term, there was no warrant in effect and there was no longer any stay of execution.

140.    Notwithstanding the expiration of the stay and its conditions, 130/40 Essex Street paid all rent that came due and the City and EDC accepted such rent without protest or reservation.

141.    The facts concerning the continued payment of rent pending appeal were not part of the record before the Appellate Division when it ruled (and, obviously had not been presented to the Civil Court because the payments occurred *after* the Civil Court entered the order on appeal to the Appellate Division).

142.    The facts concerning the continued payment of rent pending appeal were not presented to the Appellate Division when it ruled.

143.    Neither the Appellate Division nor any other court has ruled on the equitable and legal effect of the payment and receipt of rent when there was no outstanding or effective warrant of eviction as a matter of law.

144. New York law permits successive or multiple requests for vacating a warrant of eviction.

145. The warrant of eviction has not issued.

146. Good cause exists for the vacating the warrant in this case.

**AS AND FOR A EIGHTH CAUSE OF ACTION
(VACATUR OF THE WARRANT – RPAPL §749(3)
AS A RESULT OF BREACH OF CONTRACT)**

147. 130/40 Essex Street incorporates and re-alleges paragraphs 1 through 146 hereof as if fully set forth herein.

148. The Lease (Section 41.01) provides that "[EDC} shall commence ULURP in connection with the Purchase Option (as hereinafter defined) within 180 days after the first anniversary of the Commencement Date and shall use reasonable efforts to obtain all of the Disposition Approvals."

149. The Lease provides that

"Disposition Approvals" means (i) Uniform Land Use Review Procedure ("ULURP") approval for de-designation of the Premises as a public market and disposition of the same by sale, (ii) New York City Charter Section 384(b)(4) approval to have fee title to the Premises conveyed by the City to EDC, (iii) the approval of the board of directors of EDC to acquire title to the Premises from the City and convey title to the Premises to the Tenant [130/40 Essex Street], (iv) the City Environmental Quality Review ("CEQR") and/or (v) any other approvals which may be required to permit the sale of the Premises to the Tenant and, if applicable, a change in the use of the Premises at the time that such disposition is to occur.

150. EDC had not commenced ULURP on or before the requisite date, or August 11, 1999.

151. EDC never made any efforts to obtain any of the Disposition Approvals.

19

152.    As a result of EDC's failure to seek ULURP and Disposition Approvals in breach of the Lease, 130/40 Essex Street was prevented from obtaining debt or equity financing which would have permitted it to pay all rent and cure any rent deficiencies timely.

153.    The Lease contains implied covenants of good faith and fair dealing.

154.    The City and EDC breached their covenants of good faith and fair dealing by, among other things, unreasonable refusals to accept third-parties as financing sources, disparagement of the Debtor and Mr. Rainge-Megill and using the police department, fire department and building department to frustrate completion of the building and use of the premises.

155.    The facts concerning EDC's breaches of the Lease were not presented to the Appellate Division when it ruled.

156.    Neither the Appellate Division nor any other court has ruled on the equitable and legal effect of EDC's breaches of the Lease.

157.    New York law permits successive or multiple requests for vacating a warrant of eviction.

158.    The warrant of eviction has not issued.

159.    Good cause exists for the vacating the warrant in this case.

### AS AND FOR A NINTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

160.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 159 hereof as if fully set forth herein.

161.    As a result of EDC's failure to seek ULURP and Disposition Approvals in breach of the Lease, 130/40 Essex Street may lose its Lease and leasehold.

162.    As a result of EDC's failure to seek ULURP and Disposition Approvals in breach of the Lease, 130/40 Essex Street has been deprived of the use of the building and the income that would have been derived therefrom.

163.    As a result of EDC's failure to seek ULURP and Disposition Approvals in breach of the Lease, 130/40 Essex Street may lose its right to purchase the property.

164.    As a result of EDC's failure to seek ULURP and Disposition Approvals in breach of the Lease, 130/40 Essex Street may be damaged to the extent that it would be obligated to pay more for the exercise of the Purchase Option than it would have had to pay had EDC not breached the Lease.

165.    130/40 Essex Street is entitled to damages in an amount to be proved at trial as a result of these breaches.

### AS AND FOR A TENTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

166.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 165 hereof as if fully set forth herein.

167.    The Lease contains implied covenants of good faith and fair dealing.

168.    The City and EDC breached their covenants of good faith and fair dealing by, among other things, unreasonable refusals to accept third-parties as financing sources, disparagement of the Debtor and Mr. Rainge-Megill and using

the police department, fire department and building department to frustrate completion of the building and use of the premises.

169.    As a result of the City and EDC's breach of the covenants of good faith and fair dealing in the Lease, 130/40 Essex Street may lose its Lease and leasehold.

170.    As a result of City and EDC's breach of the covenants of good faith and fair dealing in the Lease, 130/40 Essex Street has been deprived of the use of the building and the income that would have been derived therefrom.

171.    As a result of City and EDC's breach of the covenants of good faith and fair dealing in the Lease, 130/40 Essex Street may lose its right to purchase the property.

172.    As a result of City and EDC's breach of the covenants of good faith and fair dealing in the Lease, 130/40 Essex Street may be damaged to the extent that it would be obligated to pay more for the exercise of the Purchase Option than it would have had to pay had EDC not breached the Lease.

173.    130/40 Essex Street is entitled to damages in an amount to be proved at trial as a result of these breaches.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

174.    130/40 Essex Street incorporates and re-alleges paragraphs 1 through 173 hereof as if fully set forth herein.

175.    The Lease contains a purchase option in Section 42.01 thereof.

176.    The period for exercise of the Purchase Option is

"from and after the date that (i) Tenant shall have Substantially
Completed the Renovation of the Building, *and* (ii) the
Disposition Approvals have been obtained, through the date that is
the earlier to occur of (x) the date that the Option Notice is
received by the Landlord and (y) the first anniversary of the later
to occur of clauses (i) and (ii) above . . ." (emphasis added).

177.    The Disposition Approvals have not been obtained.

178.    As a matter of law, and self-evidently, the period for exercise of
the Purchase Option has not commenced.

179.    For the same reason, the period for the exercise of the Purchase
Option has not ended (because the Disposition Approvals have not been obtained,
the first anniversary of that non-occurrence has not yet arrived).

180.    Section 42.02(c)(1) provides that the purchase price is to calculated
by an appraiser using the "income method."

181.    The income on the property is determined by the rent that is due
each year.

182.    During the first three (3) years of the Lease, the base rent is
$56,035 per annum.

183.    Exercise of the purchase option when the rent was low rendesr a
much lower purchase price on the income method than would be the purchase
price at a later date when the rent would have increased.

184.    The City and EDC have denied that the Purchase Option is still in
effect.

185.    A real controversy exists between 130/40 Essex Street and the City
and EDC concerning the validity of the Purchase Option.

186.    130/40 Essex Street is entitled to a declaration that the Purchase

Option is still valid, that the period for exercise of the Purchase Option has not yet

commenced and that 130/40 Essex Street can exercise the Purchase Option at a

valuation price determined as of the date when the Purchase Option would have

been exercised but for the City and EDC's breach of the Lease and other

misconduct.

## CONCLUSION

187.    The City and EDC have embarked on a campaign – for reasons

that have never been explained and which, in any event, are unconscionable – to

deprive the Debtor of its Lease and its leasehold.

188.    This Court, as a court of equity, has the power and should exercise

that power for the benefit of the estate and in accordance with clear New York

statutory and the Bankruptcy Code to reinstate the Lease.

WHEREFORE, plaintiff/debtor 130/40 Essex Street Development Corp.

demands judgment against the defendants City of New York and New York

Economic Development Corporation granting 130/40 Essex Street Development

Corp.

(1)    On the First Cause of Action, avoidance of the transfer of the

Lease and the leasehold and its recovery for the estate pursuant to Bankruptcy

Code § 548;

(2)    On the Second Cause of Action, avoidance of the transfer of the

Lease and the leasehold and its recovery for the estate pursuant to New York state

law and Bankruptcy Code § 544(b);

(3)      On the Third Cause of Action, avoidance of the stipulation requiring payments to cure any default under the Lease pursuant to New York state law and Bankruptcy Code § 544(b);

(4)      On the Fourth Cause of Action, redemption of the Lease and the leasehold pursuant to New York state RPAPL § 761;

(5)      On the Fifth Cause of Action, redemption of the Lease and the leasehold pursuant to New York state RPAPL § 761;

(6)      On the Sixth Cause of Action, vacatur of the warrant of eviction pursuant to New York state RPAPL § 749(3);

(7)      On the Seventh Cause of Action, vacatur of the warrant of eviction pursuant to New York state RPAPL § 749(3);

(8)      On the Eighth Cause of Action, vacatur of the warrant of eviction pursuant to New York state RPAPL § 749(3);

(9)      On the Ninth Cause of Action, damages to be proved at trial for breach of the obligations to seek ULURP and the Disposition Approvals;

(10)    On the Tenth Cause of Action, damages to be proved at trial for breach of the implied coventants of good faith and fair dealing;

(11)    On the Eleventh Cause of Action a declaration that the Purchase Option is still valid, that the period for exercise of the Purchase Option has not yet commenced and that 130/40 Essex Street can exercise the Purchase Option at a valuation price determined as of the date when the Purchase Option would have been exercised but for the City and EDC's breach of the Lease and other misconduct; and

(12)     Such other and further relief as to this Court may seem just and

proper.

Dated: New York, New York
       April 15, 2004

                              Law Office of Laurence J. Kaiser

                              BY:     /s/Laurence J. Kaiser
                                      Laurence J. Kaiser (LK0224)
                              *Special Counsel to the Debtor*
                              *130/40 Essex Street Development Corp.*
                              133 West 28th Street
                              New York, New York 10001
                              (917) 405-3860