UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

In re

130/40 ESSEX STREET DEVELOPMENT CORP.,                Chapter 11
                                                     Case No. 03-40944

                                   Debtor
----------------------------------------------------------------X
----------------------------------------------------------------X
130/40 ESSEX STREET DEVELOPMENT CORP.,

                                   Plaintiff,

                                                     Adv. Pro. No. 04-02978


THE CITY OF NEW YORK and THE NEW YORK
CITY ECONOMIC DEVELOPMENT CORPORATION,

                                   Defendants.
----------------------------------------------------------------X

APPEARANCES:

MICHAEL STEVEN SCHREIBER, ESQ.
Attorneys for Debtor
400 East 85th Street
Suite 6-H
New York, NY 10028

NEW YORK CITY LAW DEPARTMENT, OFFICE OF THE CORPORATION COUNSEL
Attorneys for the City of New York
100 Church Street
New York, NY 10007
By: Barbara Moretti, Esq.
    Kathleen J. Cahill, Esq.
    Hugh H. Shull, Esq.


         <u>MEMORANDUM DECISION GRANTING MOTION TO DISMISS COMPLAINT</u>

Beatty, Prudence Carter, U.S.B.J.:

        On April 15, 2004, the debtor, 130-40 Essex Street Development Corp. (the "Debtor"),

filed the complaint (the "Complaint")[1] commencing this adversary proceeding against the City of

New York (the "City") and the New York City Economic Development Corporation ("EDC")

(collectively the "City"). The Debtor sought to avoid various actions by the City to terminate the

Debtor's rights to certain premises located at 130/40 Essex Street in Manhattan (the "Premises").

Prior to filing an answer, the City moved to dismiss the Complaint ("Motion to Dismiss").[2]

      For the reasons that follow, the Court grants the City's Motion to Dismiss.

<u>STATEMENT OF THE FACTS</u>

      In 1996 Henry Rainge-Megill wanted to lease the Premises located at the northwest

corner of Essex and Rivington Streets. He approached the City regarding a lease for the

Premises which was a part of an urban redevelopment project. He proposed to develop the

Premises, which were in disrepair, and mostly unused for a number of years, as a banquet hall on

the second floor and a family-style restaurant on the ground floor as well as to reopen five

ground level kiosks on Essex Street. Negotiations followed. Due, among other things, to

Rainge-Megill's lack of experience as a developer, the City informed Rainge-Megill that he

needed a contractor/developer as a partner before it would agree to enter into any lease

agreement. See Complaint at ¶21. As a result, Rainge-Megill entered into an agreement with

GDM Development ("GDM"). See Complaint at ¶22.

      Rainge-Megill formed the Debtor of which he was, and still is, the sole shareholder. On

February 12, 1998, the Debtor as tenant and the City as landlord executed a lease for the

---

[1]Both the main case file and the adversary proceeding can be located on the electronic
case filing system ("ECF") for the United States Bankruptcy Court, Southern District of New
York, which can be accessed at https://ecf.nysb.uscourts.gov/cgi-bin/login.pl.

[2]None of the exhibits to the Motion to Dismiss were filed electronically due to their
voluminous size. However, this Court was provided with hard copies of all exhibits.

Premises (the "Lease").[3]

The Lease provided the Debtor with a rent abatement period for the initial nine months of the Lease term. See Lease at ¶3.01. Thereafter, the Debtor was to pay the annual rent in equal monthly installments.[4] The scheduled completion date for all renovations was May 12, 1999, one year after the renovations commenced. See Motion to Dismiss at p.3.

The Debtor also received an abatement from all real estate taxes for the first two years of the Lease term as well as an abatement of 50% of the real estate taxes for the three years thereafter. See Lease at ¶3.02. Under the terms of the Lease, the Debtor had an option to purchase the Premises provided the Debtor substantially completed the renovations, obtained various approvals, and was not in default at the time it gave notice to exercise the option. See Lease at ¶42.01. The purchase price was to be determined by an appraisal. See Lease at ¶42.02.

During the renovations multiple problems arose. GDM failed to make payments to various subcontractors and suppliers it had hired. See Complaint at ¶29. Unforeseen infrastructure problems were discovered in the foundation and roof as well as in the gas, plumbing and electrical systems. See Complaint at ¶30 (a), (b) and (c). Overall, the costs to renovate the Premises exceeded $1 million, twice the amount anticipated by the Debtor. See Complaint at ¶33. As a consequence, the Debtor required substantial funds in addition to those originally contemplated. Funds were borrowed from Rainge-Megill and his family members and used to pay GDM's subcontractors and suppliers in order to continue the renovations. See

---

[3] A copy of the Lease is attached to the Motion to Dismiss as Exhibit 1.

[4] The Lease fixed the annual base rent for years 1-3 at $56,035, years 4-7 at $89,656, and years 8-10 at $134,484. The rent for years 11-20 was to be based on an appraisal, inter alia, of the fair market value of the leasehold. See Lease at ¶3.01.

Complaint at ¶32.  By the end of the agreed rent abatement period, the Debtor had exhausted its

financial resources. The renovation of the Premises was, however, only approximately 95%

complete.  See Complaint at ¶ 34. The Debtor sought third party assistance to fund the

completion of the project, but the City discouraged the particular partners/investors the Debtor

proposed. See Complaint at ¶37.

On December 1, 1998, the Debtor commenced the payment of rent.  The Debtor only

paid the rent for December 1998 and for January 1999.  The Debtor thereafter failed to make any

further rent payments because it was out of funds.  See Complaint at ¶36.  Due to the non-

payment of the rent, the City served the Debtor with a rent demand.  The City then consented to

the Debtor's request for an extension of time to cure the defaults in the payment of rent.  See

Motion to Dismiss, Ex.4.  The Debtor failed to cure its defaults within the agreed-upon extension

period.

In October 1999, approximately eight months after the Debtor's last rent payment, the

City commenced a summary nonpayment proceeding in the Civil Court of New York County.

On November 8, 1999, the parties entered into a stipulation that was so ordered by the court (the

"Stipulation") in which the Debtor agreed it would pay in full all rental arrears of $37,381.64 by

paying $15,000 on or before November 25, 1999 and the remaining balance in eleven monthly

installments.[5]  In addition, the Debtor agreed to stay current on the monthly rent going forward.

Under the terms of Stipulation, if the stipulated payments were not made, the City would be

entitled to execute a warrant of eviction with proper notice of default.

The Debtor submitted a check for the first payment of $15,000 due under the Stipulation,

---

[5]A copy of the Stipulation is attached to the Motion to Dismiss as Exhibit 5.

4

but the check was rejected by the bank because the account on which it was drawn was closed. The Debtor failed to cure that default or tender the delinquent monthly payment or make any rent payments thereafter.  A warrant of eviction was issued on or about January 11, 2000.  On January 13, 2000, the City agreed to delay executing the warrant when the Debtor promised to tender a third party's check for full payment of the stipulated judgment and all subsequent rental arrears.  The Debtor failed to deliver the payment.

On February 23, 2000, the Debtor moved to vacate and set aside the Stipulation.  On March 3, 2000 the Civil Court denied the motion and vacated all previously agreed upon stays. The Debtor again moved to vacate and set aside the Stipulation on March 10, 2000 and tendered a certified check for all rental arrears.  On May 5, 2000, the Civil Court denied that motion.  The Debtor appealed the decision to the Appellate Term, which reversed the Civil Court on May 9, 2001.  The City then appealed to the Appellate Division, First Department, which reversed the Appellate Term and reinstated the warrant of eviction on February 25, 2003.  On March 31, 2003, the Debtor sought permission from the Appellate Division for leave to appeal to the New York Court of Appeals.

A few weeks later on April 18, 2003, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code ("the Code").[6]  On June 20, 2003, this Court granted the Debtor's motion to convert the case to Chapter 11.  See Case ECF Doc. No. 7.

The Debtor's request for leave to appeal to the New York Court of Appeals was denied by the Appellate Division, First Department, on December 2, 2003.  Thereafter, litigation ensued in this court between the Debtor and the City.

---

[6]All references to the Bankruptcy Code ("Code") are to the Code as in effect prior to the amendments made effective to cases filed on and after October 17, 2005.

The Complaint asserts eleven causes of action seeking multiple forms of relief, including avoidance of the termination of the Lease, a reinstatement of the Lease, avoidance of the Stipulation, vacatur of the warrant of eviction, damages as a result of alleged breach of the Lease and declaratory judgment that the purchase option was still valid.

This Court has already made final rulings with respect to Counts Four and Five. Those Counts alleged that the Debtor's waiver of its statutory right of redemption in the Lease was invalid. See Lease at ¶24.06.    Count Four claimed that New York Real Property Actions and Proceedings Law ("NYRPAPL") §761[7] required the waiver to be recorded in order to be valid. Count Five stated that the waiver was placed under an improper caption in the Lease and was therefore unenforceable.  On January 13, 2005, the Court issued an oral decision and rejected the Debtor's reading of NYRPAPL §761.  The Court held that the statute did not require the waiver to be recorded because the waiver was provided for in the Lease.  See AP ECF Doc. No. 13, (the "January 13, 2005 Transcript") at pp. 29-30.  The Court also ruled that the waiver was not facially misleading and was explicitly provided for in the Lease which the Debtor read and signed with the advice of counsel. See January 13, 2005 Transcript at p.42.  The Court held the

---

[7] Although little known, New York law provides lessees with a right of redemption similar to that provided to mortgagors.  The right is normally waived in a lease as is permitted by NYRPAPL §761 provides as follows: "Where the special proceeding is founded upon an allegation that a lessee holds over after a default in the payment of rent, and the unexpired term of the lease under which the premises are held exceeds five years at the time when the warrant is issued the lessee, his executor, administrator or assignee, at any time within one year after the execution of the warrant, unless by the terms of the lease such lessee shall have waived his right to redeem, or such lessee, executor, administrator or assignee shall have subsequently waived the right to redeem by a written instrument filed and recorded in the office in which the lease is recorded, or if not so recorded, in the office in which deeds are required to be recorded of the county in which the leased premises are located***"(emphasis added).

Debtor had no right of redemption.[8]

This Court has also ruled with finality on Counts Six, Seven, and Eight. Those Counts sought to vacate the warrant of eviction issued by the Civil Court and reinstated by the Appellate Division. Count Six was based on equitable grounds due to the Debtor's investment in the Premises. Count Seven asked this Court to rule on the legal and equitable effects of Debtor's payment of rent during the time between the Appellate Term's reversal of the Civil Court's judgment and the Appellate Divisions decision to reinstate the warrant. Count Eight sought vacatur of the warrant for a breach of covenants of good faith in connection with the City's failure to commence the Uniform Land Use Review Procedure (ULURP) process required by the New York City Charter. See Complaint at ¶152.

At this January 13, 2005 hearing, this Court also ruled with finality that it would not review the Appellate Division's decision to reinstate the warrant of eviction because, inter alia, the Debtor did not file for bankruptcy until *after* the Appellate Division ruled to reinstate the warrant. See January 13, 2005 Transcript at pp.3-15.[9]  On November 14, 2006 the automatic

---

[8]On January 31, 2008, this Court held a status conference to determine what issues remained to be resolved. The Debtor and the City both agreed the equity of redemption waiver was no longer an issue before the Court. See Case ECF Doc. No. 92 (the "January 31, 2008 Conference") at p.7.

[9]The Debtor based its argument on NYRPAPL §749(3) which does permit the issuing court to vacate the warrant. See NYRPAPL §749(3): "The issuing of a warrant for the removal of a tenant cancels the agreement under which the person removed held the premises, and annuls the relation of landlord and tenant, but nothing contained herein shall deprive the court of the power to vacate such warrant for good cause shown prior to the execution thereof."(emphasis added)

However, the case law is equally clear that the bankruptcy court cannot go behind the pre-petition decisions of a non-bankruptcy court. See, e.g. *Kelleran v. Andrijevic*, 825 F.2d 692 (2d Cir. 1987) and *Teachers Ins. & Annuity Ass'n of America v. Butler*, 803 F. 3d 61, 66 (2d Cir.1986) (bankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction). See also *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,

stay was lifted and the City was allowed to exercise its remedies under state law.  See Case ECF

Doc. No. 83.  On January 18, 2007, the City took possession of the Premises.

Counts Nine, Ten and Eleven derived from the purchase option granted in the Lease.   In

Counts Nine and Ten, the Debtor asserted breach of contract and breach of good faith and fair

dealing claims.  The Debtor sought damages to the extent it would have to pay more to exercise

the purchase option under the Lease. Count Eleven asked for a declaratory judgment that the

purchase option was still valid.  These Counts depend for their viability on the viability of the

fraudulent conveyance claims in Counts One, Two and Three.

 After the numerous hearings and rulings by this Court, the only issue remaining is

whether a fraudulent conveyance occurred upon recapture of the Premises by the City.  Count

One asserts that the execution of the warrant of eviction was a fraudulent conveyance under

Code §548(a).  Count Two claims the warrant is avoidable as constructive fraud under Code

§544(b). Count Three claims that the Stipulation is avoidable as constructive fraud under Code

§544(b).

As a result of the relief from stay that allowed the City to evict the Debtor from the

Premises, monetary relief would be the Debtor's only available remedy if this Court finds that a

fraudulent conveyance occurred.

<u>DISCUSSION</u>

On July 21, 2004, the City filed a pre-answer Motion to Dismiss the Complaint for failure

to state a claim upon which relief can be granted.  Bankruptcy Rule 7012 governs adversary

----

544 U.S. 280, 284 (2005) (holding that the Rooker-Feldman doctrine prevents lower federal
courts from exercising jurisdiction over cases brought by "state-court losers" challenging "state-
court judgments rendered before district court proceedings commenced.")

proceedings and incorporates Federal Rule of Civil Procedure ("FRCP") 12(b)(6).

A motion under FRCP 12(b)(6) tests the formal legal sufficiency of a complaint. Dismissal of an action is appropriate whenever the complaint fails to state a claim upon which relief can be granted.  In considering a motion to dismiss under FRCP 12(b)(6), the court must view the factual allegations in the complaint in the light most favorable to the pleader and accept as true all well pleaded facts in the complaint.  See *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007); see *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); see *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir. 1985).  A complaint must allege "enough facts to state a claim to relief that is plausible on its face."  See *Bell Atlantic Corp.* 127 S.Ct. at 1974.  The allegations of a complaint must be "well-pleaded" and the court need not accept "sweeping and unwarranted averments of fact."  *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987); see also 5A Wright & Miller, *Federal Practice and Procedure*: Civil 2d §1357 (2d ed. 1990).  Legal conclusions, deductions or opinions couched as factual allegations in a complaint are not given the presumption of truthfulness. See 5A Wright & Miller §1357; 2A James Wm. Moore, et al., *Moore's Federal Practice* ¶12.07[2-5], at 12-63 to 12-64 (2d ed. 1991).

Counts One through Three of the Complaint are predicated on the idea the City's recapture of the Premises under the warrant of eviction constituted a transfer which was voidable as a fraudulent conveyance.[10]  Fraudulent conveyance statutes are primarily designed and

---

[10]Count One asserts a fraudulent conveyance claim under Code §548.  Counts Two and Three are predicated on Code §544.  Code §544 allows the trustee to bring a fraudulent conveyance claim under state law which in this case is New York Debtor and Creditor Law ("NYDCL") §273.  Code §548 parallels NYDCL §273 and the two statutes are interpreted similarly by the courts. See *HBE Leasing Corp. V. Frank*, 48 F.3d 623, 638 (2d Cir 1995).  For purposes of the issues presented in this proceeding, the two statutes may be treated as

9

intended to prevent deprivations that are the result of intentional fraud or constructive fraud

resulting from wrongful or unwarranted participation on the part of the debtor, whether by

omission or commission.  See *In re Metro Water and Coffee Serv. Inc.,* 157 B.R. 742, 747

(W.D.N.Y. 1993); see also *In re Durso Supermarkets, Inc.,* 193 B.R. 682, 700 (S.D.N.Y. 1996).

        This proceeding involves a pre-petition termination of a lease for the non-payment of rent

pursuant to a statutory remedy.  There is absolutely no evidence that the termination resulted

from any collusion between the Debtor and the City designed to benefit themselves and prevent

creditors from reaching the Debtor's assets.  Although the termination of the Lease may

constitute a transfer under the broad definition provided for in Code §101(54), such a pre-

petition non-collusive termination of a commercial lease in accordance with the terms of the

lease and statutory procedure "by reason of a Debtor's material defaults, is, as a matter of law,

not a transaction or transfer which is actually or constructively fraudulent within the meaning,

intent, and underlying policy of these fraudulent conveyance laws." *Metro Water and Coffee*

*Serv. Inc.,* supra, 157 B.R. at 746; see also *In re Haines,* 178 B.R. 471, 475 (W.D.Mo. 1995)

("[The] court will not find a rightful non-collusive termination by reason of debtor's material

defaults to be a fraudulent transfer.")

        "Therefore, not every pre-petition transaction or occurrence which may technically be a
        transfer under Section 101(54) and which results in a debtor being deprived of an asset while
        it is insolvent or undercapitalized and for which it receives no consideration or less than fair
        consideration is necessarily avoidable as a fraudulent transfer.  This is so notwithstanding

---

substantively the same.
        Code §101(54) defines transfer as "every mode, direct or indirect, absolute or
conditional, voluntary or involuntary, of disposing of or parting with property or with an interest
in property, including retention of title as a security interest and foreclosure of the debtor's
equity of redemption."  NYDCL uses the term conveyance instead of transfer.  See NYDCL
§270.  The difference between the definitions of conveyance and transfer are not material to this
proceeding.

the motivation of any parties to the transaction or occurrence other than the Debtor or parties in some way associated or in collusion with the Debtor." *Metro Water and Coffee Serv. Inc.,* 157 B.R. at 747.

The court in *Durso Supermarkets Inc*. relied on this reasoning when it found that a debtor's pre-petition default under the terms of a real estate lease effected a transfer but not a fraudulent conveyance under Code §548. See *Durso Supermarkets Inc.,* 193 B.R. at 700. The *Durso* court, among others, recognized the overwhelming policy concerns with a possible finding that a valid pre-petition termination of a lease is a fraudulent conveyance. See *Durso Supermarkets Inc.,* 193 B.R. at 700.

> "The avoidance of non-collusive pre-petition lease terminations as fraudulent transfers presents significant policy considerations. Strict application of such cases*** would make it impossible to settle rights in real property. Under the ruling in *In re Edward Harvey Co.*, 68 Bankr. 851 (Bankr. D. Mass 1987), landlords cannot rely on state court judgments for termination of the lease and possession of the premises, but must wait until the statutes of limitation on fraudulent transfer actions has passed. As one authority concluded, 'the Harvey [decision]***will introduce significant degree of uncertainty into the termination of leases and the transfer, mortgaging, and insurance of property that has been subject to a lease termination.' Robert E. Goodman, Jr., Avoidance of Lease Terminations as Fraudulent Transfers, 43 Bus. Law. 807, 832 (May 1988)." *Haines,* 178 B.R. at 475.[11]

Finding that a pre-petition termination of a lease can be a transfer but is not necessarily a fraudulent conveyance is in line with those cases which have found it necessary to reconcile Code §548 with Code §365(c)(3). See *Durso Supermarkets***,** 193 B.R. at 700,701; see also *Huffman*, 171 B.R. 649 (W.D.Mo. 1994) and *Haines,* 178 B.R at 474. Code §365(c)(3) provides:

> "(c) The Trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignments of rights or delegation of duties if - ***
> (3) such lease is of nonresidential property and has been terminated under applicable non-

---

[11]Likewise, the avoidance of the Lease termination would be at odds with the Debtor's waiver of its statutory right of redemption in the Lease. See footnote 7, <u>supra</u>.

bankruptcy law prior to the order for relief***" (emphasis added).

Therefore, "if the contract or lease has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left for the [debtor] to assume or [reject]." *Huffman*, 171 B.R. at 653; *Triangle Lab., Inc.,* 663 F.2d 463, 467 (3d Cir. 1981). Here, the Appellate Division's pre-petition decision to reinstate the warrant on February 25, 2003 was an unstayed final judgment on the petition date.  As a result of that decision, the Debtor's Lease had terminated before the petition date.[12]  The filing of the bankruptcy petition did not resurrect the Lease.  A bankruptcy court does not have the power to resurrect a lease which has been terminated prior to filing of a debtor's bankruptcy petition.  See e.g. *In re Eclair Bakery LTD.,* 255 B.R. 121, 133 (S.D.N.Y. 2000)*; see also In re Triangle Laboratories Inc.,* 663 F.2d 463, 467-468 (3d Cir. 1981).

The Debtor cannot recover damages under a fraudulent conveyance theory because the Lease was validly terminated pre-petition under non-bankruptcy law. General principles of statutory construction require that a "specific provision covering a subject should be viewed as controlling when there is also a more general provision on the subject." *In re Stolz*, 315 F.3d 80, 93 (2d Cir. 2002).  This Court views Code §365(c)(3), which expressly addresses the effect of a pre-petition termination of a non-residential lease, as the more specific section of the Code.  It must be given effect to the extent it conflicts with the more general provisions of Code §548. See also *Haines,* 178 B.R at 474 (a finding of pre-petition terminations to be fraudulent conveyances under Code §548(a) would make Code §365(c)(3) inoperable and would violate

---

[12]  Of course, had the Debtor been successful in obtaining permission to appeal to the New York Court of Appeals, as well as in obtaining a favorable decision from the Court of Appeals, the Debtor would have been in a position to assume the Lease.

common statutory construction principles.)  Otherwise, there would be significant policy

concerns that Code §548 "would be used by trustees and debtors in possession to avoid the result

intended by Code §365(c)(3)."  *Haines,* 178 B.R at 475.  Because the final judgment reinstating

the warrant effectively terminated the Lease within the meaning of Code §365(c)(3) prior to the

Debtor's filing for bankruptcy and involved no collusion among the Debtor and the City, the

Debtor has no fraudulent conveyance claim on which relief can be granted.

<u>CONCLUSION</u>

For the foregoing reasons**,** this Court grants the motion to dismiss on all Counts.  As

movant, the City is directed to settle an appropriate order.

Dated: New York, New York
        October 22, 2008

__/s/ Prudence Carter Beatty__
U.S. Bankruptcy Court